NOT DESIGNATED FOR PUBLICATION

No. 114,163

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

CHASE DALTON SCOTT,
*Appellant.*

MEMORANDUM OPINION

Appeal from Butler District Court; DAVID A. RICKE, judge. Opinion filed June 10, 2016.
Affirmed.

*Adam D. Stolte*, of Kansas Appellate Defender Office, for appellant.

*Cheryl M. Pierce*, assistant county attorney, and *Derek Schmidt*, attorney general, for appellee.

Before GARDNER, P.J., LEBEN, J., and HEBERT, S.J.

*Per Curiam*: Chase Dalton Scott pled guilty to two counts of indecent liberties with a 14- or 15-year-old child and one count of possession of marijuana. He was sentenced to 32 months in prison for each count of indecent liberties and a year in jail, all to run at the same time. The district court also ordered Scott to register as a sex offender for 25 years and imposed lifetime postrelease supervision.

On appeal, Scott contends that lifetime postrelease supervision constitutes cruel or unusual punishment in violation of section 9 of the Kansas Constitution Bill of Rights and the Eighth Amendment to the United States Constitution. To determine whether a

sentence is cruel or unusual, the district court must consider three factors: (1) the nature of the crime and character of the offender; (2) how the punishment for the crime at hand compares with other serious crimes in Kansas; and (3) how other jurisdictions punish the same crimes. *State v. Funk*, 301 Kan. 925, 935-43, 349 P.3d 1230 (2015); *State v. Mossman*, 294 Kan. 901, 908, 281 P.3d 153 (2012); *State v. Freeman*, 223 Kan. 362, 367, 574 P.2d 950 (1978).

In a nine-page written decision, the district court in Scott's case carefully considered these factors and concluded that Scott's sentence was not grossly disproportionate with his crime given the facts of Scott's offense and the nature of his character. We find no error in the district court's analysis, and we affirm its judgment.

FACTUAL AND PROCEDURAL BACKGROUND

On December 3, 2014, J.R.G., then 14 years old, was reported as a runaway. The next day, police officers went to look for her at Austin Edwards' house, but Edwards said that she was at Scott's house. Officers then went to speak to Scott. He told them that he had not seen J.R.G. since the day before at McDonald's, but an officer caught J.R.G. sneaking out the back door. While at the house, the police noticed a small pipe with burn residue, which they believed was used for smoking marijuana.

Police then arrested Scott on a warrant for another matter. When questioned, Scott said that Edwards had brought J.R.G. to his house on December 3. They had remained inside except for taking a walk after dark. According to Scott, the three had smoked marijuana, and J.R.G. had then performed oral sex on him and Edwards. Scott also admitted to having sexual intercourse with J.R.G. three times. He told police that he knew J.R.G. through Facebook and had met her only briefly before at McDonald's.

2

The State charged Scott with three counts of aggravated indecent liberties with a child who was 14 or 15 years old (one for each allegation of sexual intercourse), one count of criminal sodomy with a child who was 14 or 15 years old, one count of possession of marijuana, and one count of possession of drug paraphernalia. Under the terms of a plea agreement, Scott pled guilty to lesser charges—two counts of indecent sexual liberties with a child of 14 or 15 years involving lewd fondling or touching and one count of possession of marijuana. As part of the plea, Scott acknowledged touching J.R.G.'s breasts, vagina, and bottom with his hands and penis.

Because Scott had only one prior misdemeanor conviction (for possession of marijuana), the court determined his criminal-history score to be an I, the lowest possible score. See K.S.A. 2015 Supp. 21-6809. Most sentences in Kansas are determined by a sentencing grid that is based on the seriousness of the offense and the defendant's criminal-history score. For the indecent-liberties convictions, Scott was in the border-box sentencing range, meaning he would be sentenced to prison unless the district court made certain findings in favor of probation. See K.S.A. 2015 Supp. 21-6804(f); K.S.A. 2015 Supp. 21-6804(q). Scott argued that he should be placed on probation, given that he had only a low-to-moderate risk of recidivism and would be amenable to sex-offender treatment. But the district court imposed the standard sentence of 32 months in prison for each count of indecent liberties with a child and 1 year in jail for marijuana possession, all to run at the same time. The district court also directed that Scott register as a sex offender for 25 years after serving his sentence.

The direction to register as a sex offender for 25 years comes from K.S.A. 2015 Supp. 22-3717(d)(1), which also provides that that defendants convicted of "sexually violent" crimes must be sentenced to lifetime postrelease supervision. Another subsection of the same statute, K.S.A. 2015 Supp. 22-3717(d)(5)(B), provides that "indecent liberties with a child" is a sexually violent crime for purposes of the lifetime-postrelease-supervision requirement. Mandatory lifetime postrelease supervision generally requires

3

that the person not commit any new crimes and includes conditions such as paying restitution or other costs, reporting to a supervising officer, performing community service, and abiding by any other special conditions. *Mossman*, 294 Kan. at 904.

At sentencing, Scott argued that imposing lifetime postrelease supervision would be unconstitutional as cruel or unusual punishment given his young age and proximity in age to J.R.G., his belief that J.R.G. had been older and had consented to the sexual activity, and the potential risk of life in prison if he ever committed another felony. See K.S.A. 2015 Supp. 75-5217(c). The State pointed out that Kansas law considers indecent liberties with a child to be a sexually violent crime and argued that Scott knew J.R.G. was a runaway and supplied her with alcohol and marijuana. The State contended that lifetime postrelease supervision was appropriate given that Scott had taken advantage of a 14-year-old who, because of her age, couldn't legally consent to sexual activity. At the close of the sentencing hearing, the district court requested that both parties submit proposed findings of fact to help it determine whether imposing lifetime postrelease supervision would constitute cruel or unusual punishment.

In its written ruling, the district court determined that lifetime postrelease supervision would not constitute cruel or unusual punishment under the Kansas Constitution or United States Constitution. Scott then appealed to our court. We will review the reasons the district court cited for its conclusion—and Scott's arguments of error—in the next section of our opinion.

ANALYSIS

Scott argues that the imposition of lifetime postrelease supervision violates U.S. and Kansas constitutional provisions prohibiting cruel or unusual punishment. In determining whether a sentence is cruel or unusual under the Eighth Amendment to the United States Constitution and section 9 of the Kansas Constitution Bill of Rights, the

4

district court must make both factual and legal determinations. *State v. Seward*, 296 Kan. 979, 981, 297 P.3d 272 (2013). On appeal, we review the district court's factual findings to determine whether substantial evidence supports them. We review its legal conclusions independently, with no required deference to the district court. *Funk*, 301 Kan. at 933.

These constitutional provisions differ only in their use of "and" and "or": The Eighth Amendment to the United States Constitution prohibits "cruel and unusual punishment"; section 9 of the Kansas Constitution Bill of Rights prohibits "cruel or unusual punishment." We will consider the caselaw that has interpreted each provision.

Under the Eighth Amendment, defendants may raise two types of challenges: (1) a case-specific challenge in which the defendant claims the length of his or her sentence is grossly disproportionate to the offense given all the circumstances of the case; or (2) a categorical challenge in which the defendant asserts that a particular punishment is inherently disproportionate for a specific class of offenders (*e.g.*, juveniles or those with intellectual disabilities). *Graham v. Florida*, 560 U.S. 48, 59-61, 130 S. Ct. 2011, 176 L. Ed. 2d 825 (2010). Scott makes case-specific challenges under both section 9 and the Eighth Amendment; he does not raise a categorical challenge.

The Kansas Supreme Court has said that its method for analysis of a section 9 challenge "'applies with equal force'" to a case-specific Eighth Amendment challenge. *Seward*, 296 Kan. at 990. Nevertheless, there may be some slight differences between how the Kansas Supreme Court evaluates claims under the Kansas Constitution and how the United States Supreme Court treats claims under the Eighth Amendment. See *Mossman*, 294 Kan. at 922-24. Because Scott has predominantly made arguments under the Kansas Constitution, we begin our analysis there.

*Section 9 of the Kansas Constitution Bill of Rights*

A review of the modern analysis of section 9 begins with our Supreme Court's 1979 decision in *Freeman*. The court said that a punishment could violate section 9, even if "not cruel or unusual in its method, if it is so disproportionate to the crime for which it is inflicted that it shocks the conscience and offends fundamental notions of human dignity." 223 Kan. at 367. The court set out a test using three factors, now called the *Freeman* factors, to analyze the issue:

> "(1) The nature of the offense and the character of the offender should be examined with particular regard to the degree of danger present to society; relevant to this inquiry are the facts of the crime, the violent or nonviolent nature of the offense, the extent of culpability for the injury resulting, and the penological purposes of the prescribed punishment;

> "(2) A comparison of the punishment with punishments imposed in this jurisdiction for more serious offenses, and if among them are found more serious crimes punished less severely than the offense in question the challenged penalty is to that extent suspect; and

> "(3) A comparison of the penalty in other jurisdictions for the same offense." 223 Kan. at 367.

Our Supreme Court continues to rely on the *Freeman* factors to determine whether a sentence is so disproportionate as to be cruel or unusual. *Funk*, 301 Kan. at 935; *Mossman*, 294 Kan. at 908. No one factor is controlling, and courts should consider each prong of the test, but one factor may weigh so heavily in a specific case that it determines the outcome. *Funk*, 301 Kan. at 935. In considering the proportionality of a sentence, or how well the punishment fits the crime, the case-specific facts are a "'"necessary part of the overall analysis.'"" 301 Kan. at 935 (quoting *Mossman*, 294 Kan. at 908).

6

*Freeman Factor 1: Nature of the Offense and Character of the Offender*

Based on the charges in the case, the district court characterized the nature of the offense as sexual intercourse with a 14-year-old female, even though Scott was convicted of lewd touching. The district court concluded that sexual activity with a 14-year-old, whether intercourse or lewd touching, is a "serious crime." The court noted that indecent liberties with a child is by definition a "sexually violent crime," see K.S.A. 2015 Supp. 22-3717(d)(5)(B), which merits lifetime postrelease supervision. The Kansas Supreme Court in other cases has specifically agreed with the district court's characterization of sexual activity with a minor as a serious offense. See *Funk*, 301 Kan. at 940; *Mossman*, 294 Kan. at 909-10.

The district court then discussed Scott's character, drawing from a psychological evaluation performed by Dr. Jarred Steffan. According to the court, the evaluation noted that Scott was "19 years old (at that time), of borderline to low intelligence and was sexually promiscuous." Dr. Steffan did not diagnosis Scott with pedophilia or psychopathy but instead viewed the sexual offense as "'a reflection of his pleasure and sensation seeking lifestyle marked by substance dependence, compromised judgment, poor problem solving and life skills, and intimacy deficits.'" The evaluation also said that with appropriate interventions, Scott had a low-to-moderate risk of reoffending and "'a favorable prognosis for improvement.'" According to the evaluation, Scott had no history of childhood abuse or neglect but did have a history of marijuana and methamphetamine use.

The district court also noted several troubling aspects involving Scott's character:
- Scott "attributed the illegal sexual encounter to the 14 year old victim, indicating that she was a willing and cooperative participant and that she initiated the sexual relations."
- Scott did not attempt to verify J.R.G.'s age before having sex with her.

- While the court noted that Scott had expressed regret for having sexual relations with J.R.G. and empathy toward her for any adverse effects he may have caused, the court characterized his behavior as "'casual, uncaring and detached.'" It further observed that the crime involved "the exploitation of a known runaway" and subjected J.R.G. "to the risks of pregnancy and venereal disease, as well as other particularly devastating effects including psychological harm or other physical harm."

The court concluded that the first *Freeman* factor weighed in favor of imposing lifetime postrelease supervision: "Scott's individual characteristics place him into a category of offender who present a special problem and concern for society and therefore, he must be watched closely during . . . the remainder of his life . . . ."

On appeal, Scott maintains that the district court wrongly determined that the first *Freeman* factor weighed in favor of imposing postrelease supervision. He again contends that he had believed he was engaging in consensual sex with an adult when he had sex with J.R.G. And he emphasizes that he did not have a violent past or history of sexual misconduct, had not been diagnosed as having either pedophilic or psychopathic behaviors, and had a favorable prognosis for improvement with treatment.

Scott argues that some of the district court's reasoning is unsupported or unreasonable. In particular, he rejects the court's implication that he should have tried to verify J.R.G.'s age because "it is unreasonable to require teenagers to have the requisite knowledge to verify age from a valid ID." He notes that nothing in the record proves whether he specifically knew that J.R.G. was a runaway, in response to the court's contention that he exploited a "known runaway." Finally, he contests the relevance of the court's assertion that he subjected J.R.G. to risks of pregnancy and disease, given that sexual intercourse naturally exposes participants to those risks. He contends the court should assume that the severity level of the offense takes the risk of harm into account.

8

As to whether Scott exploited a "known runaway," the court's claim that he did is unsupported. The State had alleged that Scott knew J.R.G. was a runaway during the sentencing hearing, but that allegation was not addressed or substantiated in the district court's factual findings. Scott does not argue that any of the district court's other findings are unsupported, so we regard the remainder of the district court's factual findings as supported by substantial evidence. See *Funk*, 301 Kan. at 936; *State v. Reed*, 300 Kan. 494, Syl. ¶ 5, 332 P.3d 172 (2014) ("An issue not briefed by an appellant is deemed waived and abandoned.").

Scott's claim that he believed J.R.G. was 18 years old at the time is a factual question that was not resolved by the district court, so it cannot factor into the analysis on appeal. Our Supreme Court faced the same situation in *Funk*, where it said that the defendant's belief that victim was 16 was "a fact question left unresolved by the district court and therefore cannot factor into our analysis." *Funk*, 301 Kan. at 940; see also *State v. Seward*, 289 Kan. 715, 720-21, 217 P.3d 443 (2009) (noting the general rule that a litigant who fails to object to inadequate findings and conclusions cannot make appellate argument based on what is missing), *disapproved on other grounds by State v. Jolly*, 301 Kan. 313, 342 P.3d 935 (2015).

Scott's contention that J.R.G. consented or actively participated in the sexual contact is unpersuasive. In *Mossman*, the Kansas Supreme Court rejected a similar argument that the 15-year-old victim encouraged and willingly participated in the sexual activity, noting that Kansas law treats those under 16 as being legally incapable of consenting to sex and that an adult "who comes in contact with a minor, even a seemingly mature minor, is expected to protect the child from the child's poor judgment, not take advantage of that poor judgment." 294 Kan. at 910.

9

Scott is no doubt correct that some aspects of the potential harm to a child victim of a sex crime are among the reasons that the crime's prison sentence and severity level are significant. But that doesn't mean we ignore harm to the victim in the *Freeman*-factor analysis; to the contrary, we may consider the risk of psychological or physical harm to the victim in considering whether lifetime postrelease supervision is proportionate to the nature of the offense. See *Funk*, 301 Kan. at 940 (citing *Mossman*, 294 Kan. at 909); *State v. Toahty-Harvey*, 297 Kan. 101, 107-08, 298 P.3d 338 (2013) (noting potential of psychological harm from sexual trauma).

In asserting that the district court was wrong when it determined that the first *Freeman* factor weighed in favor of imposing lifetime postrelease supervision, Scott also relies on a comparison between his case and *State v. Proctor*. See *State v. Proctor*, 47 Kan. App. 2d 889, 280 P.3d 839 (2012) (*Proctor I*); and *State v. Proctor*, No. 104,697, 2013 WL 6726286, at *1 (Kan. App. 2013) (unpublished opinion) (*Proctor II*), *rev. denied* 299 Kan. 1273 (2014). In that case, a panel of this court held that a defendant's sentence to lifetime postrelease supervision in an aggravated-indecent-solicitation case was unconstitutional under section 9 of the Kansas Constitution and the Eighth Amendment to the U.S. Constitution. *Proctor I*, 47 Kan. App. 2d at 889. The Kansas Supreme Court summarily reversed the case and remanded to the Court of Appeals in light of new caselaw, but our court issued a new opinion reaching the same result. *Proctor II*, 2013 WL 6726286, at *1.

In *Proctor*, the defendant was 19 years old and had on multiple occasions "'cajoled [a 12-year-old boy] into having manual and oral contact with [his] penis.'" *Proctor II*, 2013 WL 6726286, at *2. In finding that the first *Freeman* factor weighed in Proctor's favor, the *Proctor* court relied on several factors: the district court's determination to impose probation rather than imprisonment, the prospect of a lifetime prison sentence for any future felony conviction, Proctor's young age and lack of criminal record, the lack of evidence that he had previously sexually abused anyone, and Proctor's own history as a

victim of sexual abuse during adolescence and lack of professional help to cope with that trauma. 2013 WL 6726286, at *4-5. The *Proctor* court distinguished other cases that found the first *Freeman* factor weighed against defendants convicted of sex crimes by noting that the other defendants were older, had not been victims of sexual abuse themselves, and "plainly were not replicating conduct that had been directed toward them." 2013 WL 6726286, at *5. The court emphasized that its determination relied heavily on the district court's decision to place Proctor on probation, which reflected the district court's determination that Proctor would benefit more from counseling and treatment than imprisonment and that he would not jeopardize public safety by being out in the community. 2013 WL 6726286, at *4-5. The court noted that "[t]he circumstances would be different if Proctor had juvenile adjudications or criminal convictions for serious offenses." 2013 WL 6726286, at *5.

The holding in *Proctor II* remains a narrow exception to the overwhelming majority of cases that hold the first *Freeman* factor weighs in favor of imposing lifetime postrelease supervision. See, *e.g.*, *Mossman*, 294 Kan. at 912; *State v. Cameron*, 294 Kan. 884, 892, 281 P.3d 143 (2012). It's not clear how many of the special factors listed in *Proctor II* must apply to a case to shift the weight of the first *Freeman* factor the other way, as no other cases have reached the same result. See, *e.g.*, *Funk*, 301 Kan. at 937-38; *State v. Riffe*, No. 113,746, 2016 WL 937869, at *9-13 (Kan. App. 2016) (unpublished opinion) (reversing district court's decision that relied on *Proctor I* when none of the factors applied); *State v. Long*, No. 111,720, 2015 WL 2136628, at *4 (Kan. App. 2015) (unpublished opinion) (declining to extend *Proctor II* because 18-year-old defendant had adjudication for sex offense, he wasn't a victim of sexual abuse himself, and the court imposed prison rather than probation).

In *State v. Funk*, for example, the Kansas Supreme Court determined that *Proctor II* couldn't apply because the defendant had failed to present evidence of his risk of recidivism or background and had a serious criminal conviction (burglary) on his record.

11

301 Kan. 925, 937-41, 349 P.3d 1230 (2015). Funk was young (18 or 19 years old) and had engaged in sexual activity (oral sex) with a 14-year-old girl after the two had been drinking and doing drugs with Funk's other friends. The court stated that without the necessary evidence of Funk's character and the district court's factual findings based on that evidence, it would "adhere to our previous observation that '[p]ostrelease supervision is largely designed to act as a deterrent to future crime, a goal that is particularly legitimate given sex offenders' higher rate of recidivism.'" 301 Kan. at 939 (quoting *Mossman*, 294 Kan. 901, 911, 281 P.3d 153 [2012]).

The Kansas Supreme Court has upheld sentences of lifetime postrelease supervision in a case in which the defendant presented a lack of criminal history, low risk of committing a similar crime, acceptance of responsibility for criminal conduct, and an appropriate level of remorse. *Mossman*, 294 Kan. at 911-12. In *Mossman*, the 25-year-old defendant engaged in a sexual relationship with a 15-year-old and was convicted of aggravated indecent liberties for sexual intercourse with a child of 14 or 15. After noting the factors in Mossman's favor, the court also noted that the psychological evaluator had expressed concern about Mossman's lack of impulse control and rebellious nature. Ultimately, the court concluded that the first *Freeman* factor weighed in favor of imposing lifetime postrelease supervision because of the seriousness of the crime; Mossman's disregard of the victim's age even though he knew she was a minor; his lack of impulse control and rebellious nature; and the purposes of lifetime supervision, including retribution, deterrence, incapacitation, and rehabilitation. 294 Kan. at 912.

Scott also cites *State v. Dull*, 302 Kan. 32, 351 P.3d 641 (2015), *cert. denied* 136 S. Ct. 1364 (2016), to support his argument. In *Dull*, the Kansas Supreme Court found that mandatory lifetime postrelease supervision is always cruel and unusual punishment for juveniles, in part because juveniles' diminished culpability, immaturity, recklessness, poor decision-making skills, and lower risks of recidivism all diminish the punishment goals of lifetime supervision. 302 Kan. at 60-61. Scott contends that even though he was

not legally a minor, given his young age and resulting immaturity, the reasons in *Dull* apply to him as well. But even though maturity may not be fully realized when a person turns 18, turning 18 reflects an important legal milestone: "The law clearly presumes that people 18 years of age or older have reached a level of maturity that renders them fully culpable for the crimes they commit." *State v. Ruggles*, 297 Kan. 675, 685, 304 P.3d 338 (2013) (rejecting Eighth Amendment categorical challenge to "hard 25" life sentence for soliciting child under age 14 to engage in lewd fondling or touching).

With all of these cases in mind, we return to Scott's argument that he, like the defendant in *Proctor*, should not be subjected to lifetime supervision. In Scott's favor, he was only 19 when he committed the offense and had very little criminal history—one misdemeanor conviction for marijuana. The district court recognized that he had a favorable prognosis and would be "amenable to treatment." On the other hand, the court noted that he had a "'pleasure and sensation seeking lifestyle,'" substance-abuse issues, compromised judgment, and poor problem-solving and life skills. These characteristics resemble the defendant in *Mossman,* who lacked impulse control and had a rebellious nature—although Mossman was older (in his mid-20s), and the evaluator's characterization of Scott probably describes many 19-year-olds. While Scott had expressed remorse about the crime, the district court described him as uncaring and detached and noted that he blamed J.R.G. for the illegal sexual activity. Unlike the defendant in *Proctor*, Scott had no history as a victim of sexual abuse and was sentenced to prison rather than placed on probation. These were points that the *Proctor* court had strongly emphasized when weighing the first *Freeman* factor. *Proctor II*, 2013 WL 6726286, at *4-5. Finally, while an evaluation concluded that Scott had a low-to-moderate risk of reoffending, a moderate risk can still be a significant one, especially in light of the harm that this type of crime can cause.

We find no error in the district court's finding that the first *Freeman* factor weighs in favor of imposing lifetime postrelease supervision. The offense was a serious crime

against a minor who couldn't legally consent to sexual activity, Scott failed to accept full responsibility for his actions, and he exhibited poor judgment. In addition, the district court determined that prison, not probation, was the appropriate sentence. In these circumstances, lifetime postrelease supervision seems a reasonable measure to prevent him from reoffending.

*Freeman Factor 2: Comparison of Punishments in Kansas*

The second *Freeman* factor calls for comparing the punishment in this case with punishments imposed for other, more serious crimes in Kansas. If the comparison shows that the more serious offenses are punished less severely than Scott's offense, "the challenged penalty is to that extent suspect." *Freeman*, 223 Kan. at 367. In determining whether the sentence imposed on the defendant is grossly disproportionate to sentences for more serious offenses, the court also considers the broader purposes of the sentence under review, the seriousness of the defendant's crime, and other considerations examined in the first *Freeman* factor. *Funk*, 301 Kan. at 941 (citing *Mossman*, 294 Kan. at 917).

The district court found that lifetime postrelease supervision was not grossly disproportionate to penalties for other crimes, considering the seriousness of the offense and the societal and punishment goals in imposing lifetime postrelease supervision. The court relied heavily on the holding in *Mossman*. In that case, the Kansas Supreme Court rejected a defendant's argument that imposing lifetime postrelease supervision for aggravated indecent liberties with a child was grossly disproportionate to the punishment for second-degree murder (which would only require 36 months of postrelease supervision), given the purposes of lifetime postrelease supervision, the seriousness of the crime, and other concerns addressed in the first *Freeman* factor. *Mossman*, 294 Kan. at 912, 917. The *Mossman* court concluded that the difference in proportionality between Mossman's sentence and one for other serious crimes (such as second-degree murder)

14

was "not so significant that the second *Freeman* factor outweighs the first *Freeman* factor." 294 Kan. at 917. The district court here also noted that although *Mossman* addressed a more serious sex offense than Scott had been convicted of, another Kansas Supreme Court case adopted the same reasoning for a similar level of sex offense. See *State v. Cameron*, 294 Kan. 884, 281 P.3d 143 (2012).

Scott first contends that lifetime postrelease supervision is cruel or unusual because if he is ever convicted of another felony, even a minor one, he may be ordered to serve life in prison. K.S.A. 2015 Supp. 75-5217 provides that if a defendant under postrelease supervision gets a conviction for a new felony, he or she "shall serve a period of confinement, *to be determined by the prisoner review board*, which shall not exceed the remaining balance of the period of postrelease supervision." (Emphasis added.) Accordingly, the length of any potential future confinement won't be determined until a future offense has been committed and its seriousness can be evaluated. In this circumstance, the Kansas Supreme Court has held that it will not consider what might happen if a defendant commits a new felony when analyzing whether lifetime postrelease supervision is unconstitutional. *Funk*, 301 Kan. at 938 (citing *Mossman*, 294 Kan. at 915-16).

Scott additionally argues that lifetime postrelease supervision is disproportionate to the other sentences imposed for "more serious" offenses. In Kansas, most prison sentences are based on the severity level of the crime and the defendant's criminal history. The severity level of a crime is set by statute, ranging from 1 (most serious) to 10 (least serious); the more serious the crime, the longer the possible sentence. See K.S.A. 2015 Supp. 21-6804(a). Scott identifies several offenses that are severity-level-1 or -2 felonies and that would require only 36 months of postrelease supervision. See K.S.A. 2015 Supp. 22-3717(d)(1)(A). Scott's offense, indecent liberties with a child, is a severity-level-5 offense but carries lifetime postrelease supervision. From this, Scott concludes that lifetime postrelease supervision is disproportionate to his crime because a

15

person sentenced to a higher severity-level offense would finish his or her entire sentence (including postrelease supervision) before Scott would.

But in *Funk* and *Mossman*, the Kansas Supreme Court explained that this type of comparison is not persuasive—the proportionality of a defendant's sentence cannot be judged solely by comparing the lifetime-postrelease-supervision period to that for other crimes. 301 Kan. at 941 (citing *Mossman*, 294 Kan. at 913-14). Scott's offense carried only a 31- to 34-month sentence based on his criminal-history score, but all of the offenses he uses for comparison would include much longer prison sentences (109 to 165 months for someone with the same criminal history). See K.S.A. 2015 Supp. 21-6804(a). While Scott's overall sentence might be longer than sentences for those other offenses due to postrelease supervision, he has the opportunity to serve most of the time in a less restrictive environment than prison. See *Mossman*, 294 Kan. at 913. The *Funk* court suggested that it would be more appropriate to compare the punishments for sex crimes and noted that more serious sex crimes are punished more severely (that is, with longer prison sentences), even if the postrelease-supervision period is the same. *Funk*, 301 Kan. at 941-42. We find no error in the district court's determination that the second *Freeman* factor weighed in favor of imposing lifetime postrelease supervision.

*Freeman Factor 3: Comparison with Punishments in Other States*

The third *Freeman* factor requires the court to compare the penalty of lifetime postrelease supervision for this offense with punishments for the same offense in other states. Relying on *Mossman* and *Cameron*, the district court held that lifetime postrelease supervision was not so disproportionate to other jurisdictions' punishments as to "shock[] the conscience and offend[] fundamental notions of human dignity," especially "in light of the strength of the first <u>Freeman</u> factor."

Scott acknowledges that some other states impose mandatory lifetime postrelease supervision for the same offense but still argues that the Kansas punishment "is the harshest and most severe in the country," noting that some jurisdictions allow offenders to be released from postrelease supervision. He does not focus on how other jurisdictions punish his specific offense but rather discusses other jurisdictions' use of lifetime postrelease supervision.

In *Mossman*, the Kansas Supreme Court conducted an extensive analysis of other jurisdictions that impose lifetime postrelease supervision for someone over age 18 having intercourse with a 15-year-old. It noted that even though very few states called for mandatory lifetime postrelease supervision, Kansas was not the only state to do so, and it was not aware of any other court that had found lifetime postrelease supervision for a sex offender to be cruel and unusual punishment. Our Supreme Court concluded that the "lack of strict proportionality with other sentences in Kansas and other jurisdictions" did not outweigh the first *Freeman* factor, especially since the sentence was not grossly disproportionate. 294 Kan. at 920-21. *Cameron* likewise discussed other jurisdictions that impose lifetime supervision for crimes like Kansas' aggravated indecent solicitation of a child and similarly concluded that lifetime postrelease supervision was not grossly disproportionate. *Cameron*, 294 Kan. at 894-95. The same analysis applies here, and Scott failed to make a more targeted appeal by citing to penalties for the same crime. See *Funk*, 301 Kan. at 942. The district court correctly determined that lifetime postrelease supervision "is not so disproportionate to the crime that [it] shocks the conscience and offends fundamental notions of human dignity" such that the punishment is cruel or unusual.

*The Eighth Amendment*

Scott also raises an Eighth Amendment challenge to his sentence based on the specific facts in his case. In his brief, Scott cites the factors of the Eighth Amendment test

17

as analogous to the *Freeman* factors; the crux of his argument is based on the *Freeman* factors. The State contends that Scott has not suggested any reasons for finding the sentence disproportionate under the Eighth Amendment to the United States Constitution if the court has rejected such an argument under section 9 of the Kansas Constitution Bill of Rights. See also *Cameron*, 294 Kan. at 895-96 ("Cameron does not suggest any reason why our application of the *Freeman* factors would not control the case-specific considerations under the Eighth Amendment."). But in *State v. Swint*, 302 Kan. 326, 347-49, 352 P.3d 1014 (2015), the Kansas Supreme Court held that because Swint simultaneously made both his state and federal constitutional arguments and supported his Eighth Amendment claim with federal caselaw, the court would separately consider the merits of his Eighth Amendment claim.

Whether a sentence is cruel and unusual punishment under the Eighth Amendment is based on whether the punishment is proportional and appropriately measured to the offense. *Graham*, 560 U.S. at 59. Scott raises a case-specific challenge to lifetime postrelease supervision, meaning he argues that the punishment is not proportional to the crime given all the circumstances in his particular case. See 560 U.S. at 59. The relevant test under the Eighth Amendment requires that the court first compare the seriousness of the offense and the severity of the punishment. If that comparison leads the court to infer that the sentence is grossly disproportionate, then the court compares the sentence with sentences received by other offenders in the same jurisdiction and with sentences imposed for the same crime in other jurisdictions. 560 U.S. at 60 (citing *Harmelin v. Michigan*, 501 U.S. 957, 1005, 111 S. Ct. 2680, 115 L. Ed. 2d 836 [1991]).

In comparing the seriousness of the offense and the severity of the punishment, a court may consider "the offender's mental state and motive in committing the crime, the actual harm caused to the victim or to society by the offender's conduct, any prior criminal history, and a particular offender's propensity for violence." *Swint*, 302 Kan. at 347 (quoting *State v. Woodward*, 294 Kan. 717, 721, 280 P.3d 203 [2012]). But it is a

rare case in which a court will determine the sentence is grossly disproportionate to the offense based on this analysis. *Graham*, 560 U.S. at 60. In *Mossman*, the Kansas Supreme Court cited to several United States Supreme Court cases upholding 25-year-to-life sentences for third-strike convictions for theft or nonviolent crimes and concluded that state legislatures have "considerable latitude" in determining the severity of criminal sentences. 294 Kan. at 923-24.

The *Mossman* court also quoted Justice Kennedy's conclusion, considering the sentence for possession of a large quantity of cocaine, that "'no sentence of imprisonment would be disproportionate'" because possessing a large quantity of cocaine was just as serious and violent as felony murder. 294 Kan. at 923-24 (quoting *Harmelin*, 501 U.S. at 1004). Although Justice Kennedy's opinion was merely a concurrence, the *Mossman* court found it persuasive and concluded that it would be "reasonable to substitute aggravated indecent liberties with a child" into that statement because sex offenders are a "particularly serious threat" to public safety and are more likely than other criminals to commit violent crimes following their release from prison. 294 Kan. at 924. The *Swint* court analyzed this portion of *Mossman* and concluded that Swint's sentence to life with no chance of parole for 25 years was not grossly disproportionate given "the court's suggestion in *Mossman* that no term of imprisonment might be grossly disproportionate to the crime of aggravated indecent liberties for Eighth Amendment proportionality purposes." 302 Kan. at 349.

In this case, Scott engaged in sexual activity with a 14-year-old, a serious crime. Scott had a low-to-moderate risk of reoffending, but the evaluator and district court were also concerned about some of his personality characteristics, including his pleasure-seeking lifestyle and poor judgment. He also did not fully accept responsibility for his actions. And lifetime postrelease supervision minimizes the "particularly serious threat" that sex offenders pose to society. The district court thoroughly analyzed these factors, and we find no error in its conclusions that Scott's sentence to lifetime postrelease

supervision was not grossly disproportionate to his crime and that the sentence did not violate either the Eighth Amendment to the United States Constitution or section 9 of the Kansas Constitution Bill of Rights.

We therefore affirm the district court's judgment.